and Ms. Haynes, whenever you're ready to hear from you. Good morning, your honors. My name is Elizabeth Haynes. I'm an assistant federal public defender. With me at council table are Kevin Johnson and Fran Pratt. Your honors, the time has come for this court to recognize what numerous other circuit courts and Supreme Courts have recognized, that there are a host of problems associated with eyewitness identification. Juries need to be told what these problems are, and the government does not dispute the science that we presented to the district court. And those types of issues should be raised with juries. Now, in this case, I will focus on the eyewitness identification issues, primarily the voir dire, the jury instruction, and the exclusion of our expert. And we'll just briefly touch on DNA as it has some bearing on the weight of the evidence. In this case, we presented to the court several issues relating to eyewitness identification. The first issue were the voir dire questions, in which we did submit a host of questions. But two in specific that I would raise with the court is we asked the district court to ask, have you ever conducted an eyewitness identification? Have you ever participated in an eyewitness identification? The government objected to that, and part of the basis of their objection was that we have jury instructions to deal with these types of issues. Now, certainly asking those questions would have just taken moments, and just as the district court asked, have you been a victim of a crime? A natural second question to that would have been, as part of dealing in that case, did you participate in an eyewitness identification? And the court refused to ask those questions. On the heels of that, we then presented expert testimony relating to eyewitness testimony. And I think that it is worth looking at that opinion of the district court, because what was apparent in the testimony of our expert is that he went through each of the factors that would bear upon the eyewitness identification. And, for example, weapon focus. There was weapons in both of these crimes, and what he said was, this is not within the common knowledge of the jury. And so, for example, he testified that 52% of individuals agree that when a weapon is present in a crime, that will make the identification less likely to be accurate. 48% of people that were queried said, in fact, that the presence of a gun would have no bearing, or, in fact, the opposite, that the presence of a gun would make the identification more likely to be accurate. In every case involving conduct, traffic light, red light, green light, the fact that the radio was on, you get an expert witness to say radios are distracting and, therefore, the person didn't see the light, or they had the telephone on. I wonder where it leads to when you let experts tell juries what is implicating their function. I mean, basically, they are going to assess the testimony that's given and the cross-examination that's allowed. But to have an expert come and tell them people can't see things when they're distracted or under stress, or people can miss things in fast going, or they're having a lot of fear, it sort of doesn't lead to a big problem to allow experts in that kind of circumstance to assist the jury where the jury is perfectly capable of understanding that? Well, not in this case, because what the science tells you is that the jury is not capable of understanding that for themselves. As to each of these factors, Professor Cutler provided testimony. Why isn't the jury? I'm not sure that an expert can come and impeach the quality or the abilities of the jury, that juries can't assess it or understand facts that are in the day-to-day life. We've never allowed, for instance, experts to come in and say, compare one face to another, which is much more scientific. They measure the distance between the eyes. They have a picture, and then they have the defendant, and they measure all the different components. We don't permit that. We let the juries make its assessment on that. Have an expert tell the jury how it is to receive evidence in a context, which it seems to me you can establish very well in cross-examination. You can ask Ms. Smith, were you under stress? Did you see a gun? Are you sure you saw this? How long did you get to see him? How close were you to him? Was the lighting good? These are things that you can bring out and did bring out. Your Honor, I'd make two points. One is that we're not instructing the jury how to weigh the evidence. We deal in percentages every day. For example, this morning when you woke up, you looked at the forecast. It may have said there's a 30 percent chance of rain. And based on that, you may— Very long most of the time. But we deal in those types of—given that type of information all of the time. And all that we sought to do was to tell the jury something that science has established is not in their common knowledge, which is that these factors can impact their decisions. What difference does it make? Because they're going to assess their decisions on what they see and hear, and they don't need science to tell them why they're seeing and hearing it. Well, they do. In fact, they would need science to tell them because what Dr. Cutler testified to is that they would misunderstand this testimony. Now, as to your point about the cross-examination— So would a jury, in your example, need an expert to know what significance to put to a weather forecast of 30 percent rain? In that case, no, because they've been told that there was a 30 percent chance of rain. All that we're seeking here is that the jury be instructed on what impact these factors have. Now, Judge Niemeyer had asked about why can't we just simply cross-examine— No, why can't we simply—well, that is true, but why do we have to tell the juries—analyze why the jury reaches a conclusion? You're going to reach a conclusion in this case. You're not aware of the fact that there's evidence of this kind and this kind, and you should be cautioned that when you reach this conclusion—I mean, we can't tell juries that type of stuff. What courts have recognized is that, based on the host of problems with eyewitness identification, that we do need to tell juries. Now, the Innocence Project has noted that 75 percent of wrongful convictions involved eyewitness identification, and 36 percent involved two eyewitnesses falsely identifying a person. And what that tells us is we do, in fact, need to tell juries this type of information. And, in fact, we tell jurors and we instruct them all the time. For example, if you take the idea of a confidential informant, it is inherent, it is understandable that confidential informants have other interests involved and that their testimony should be scrutinized with that in mind. But we still— Well, should we allow an expert to say, a witness has entered into a plea agreement agreeing to cooperate, and if he cooperates and tells the truth at trial, he'll get a lower sentence. So are we going to allow an expert to tell the jury, this man has a real interest to lie, and we have observed that in lots of cases people have lied in order to get better sentences. Would we allow that type of testimony? You would not allow that type of testimony, but this is a different— The jury can make that assessment. It can be impeached, the witness can be impeached, and if the witness is lying, that's what the whole trial process is. But to have an expert come in and tell the jury how it should approach and the effect on psychological approach on these things really would start making trials something quite different from what they are today. What—I mean, the standard to be applied in the expert arena is the scientific information, and the government conceded that it was. And so then the second question is whether it's helpful. And in this case, you have a district court who only heard that jurors do not understand this information, that they misconstrued it, and that their conclusions are inaccurate. And the only conclusion that he drew was that it is in the common knowledge of the jury, but the only evidence that he had before him was that it was not. And that's plain error. In this case, there was also a video, at least one video, that the jurors could watch for themselves. So doesn't that weaken your argument that an expert on the eyewitness testimony was necessary because the jury could see with their own eyes? No, Your Honor. That video was extremely grainy. All that it really provided was just—you could see the individuals. You could not make out their faces. You could simply see their relative sizes. Well, it's not quite so. There's quite a bit. I looked at that, and you could tell that one was tall and had a limp and had a cane. That's correct. One was short. You could see that they're African American. You could see the shape of the hat. One of them wore a peculiar hat with a short bill and sort of a Sherlock Holmes type of hat. And you could see that they used the same modus operandi. They came in, and in one case, they had a gun left behind, and they left their hats behind. I don't remember if a video showed any cars. Your Honor, if you—I would agree with the court as to those factors. But if you take out the eyewitness identifications in this case, especially, for example, with the family dollar, what you had was a similar hat and a similar car. That was the testimony. Those are the only two facts. You also had multiple eyewitnesses in the family dollar situation. And some of those eyewitnesses had a fair amount of time, even before the robbery, with the defendants. And they were close up, face to face. There wasn't a problem with distance. There wasn't a problem with lighting. And the same thing with the robbery in the garage. I mean, they were face to face because they were fighting. And there was an extended period of time. I mean, doesn't that severely undercut your argument on the need for some sort of an expert when it's eyewitness? Because it's not one—the case isn't built on one eyewitness. It's built on multiple eyewitnesses, along with a lot of circumstantial evidence. You had a lot of evidence. I think if you had no identification evidence, it would have almost been conclusive. I mean, you had the cars linked—both cars linked to Leona. You had a car missing a hubcap. You had one wearing the bracelet, which was identified. The one who was arrested had the keys to both cars and the residence. You had the DNA. You had the videos showing how many times will you have a robbery, a store robbery, which involves a tall man and a short man. The tall man has a limp and walks with a cane within a few blocks of each other and within a short period of time. It seems to me that there's just no question that these people were implicated by the evidence. Your Honor, I would focus your attention on the family dollar. And I would say at the outset that these two crimes should be considered—the evidence as to each should be considered apart from each other. And also that both defendants must be considered— Well, the commission of the crime, but the identification of witnesses, they tried together these two crimes. And it was the same person on the videos. You can see the videos. You can see the same persons. The chances of having two people like that, I'll bet you, is one in a billion. Your Honor, I do represent in this both James and Troy Baylor. And I would agree with the court that you can see the limp of the taller individual. You see the two coming in together. Same hat in both pictures. Same dress. Same cane. Same limp. Both of them were connected to the same two vehicles. And it turns out both vehicles were owned by their parents. As an initial matter, you cannot—it is improper. There is a jury instruction which says you should consider each defendant, each crime separately. Of course you have to. But you also can consider circumstantial evidence when another crime happens and there's evidence that they find— what if a second crime happens and they find loot from the first crime in the car? That implicates the first crime. But that's not what happened here, and I would also make— Sure it was. They traced these cars to the house. They traced the vehicles. Both these fellows were in the same vehicles. The vehicles were identified. The vehicles were not identified. Mrs. Goh testified that the vehicle that she saw at the Family Dollar was similar to the vehicle owned by— What about Officer Spencer or Spence? That relates us to the Wilsons robbery, the car robbery. But if you look at the evidence as to the Family Dollar, all that the government relied upon was a similar hat. The hats were not identical. They were similar. And secondly, that the car was similar. And as to the identifications, one of those identifications was done with a lineup. It was not done double-blind. The investigating officer— How was Smith's done? Hers was done—it was done via a lineup, a pitcher lineup. She picked out both defendants, didn't she? She did, but the investigating officer was in the room with her. And the other two individuals— Is there any evidence that the officer influenced her decision? Well, of course not. I thought she picked out both. Of course not. But it is—this court, other courts have recognized that the mere possibility of that, if not meriting an expert testimony, should have required a jury instruction. And the largest problem— This is a jury instruction on what? On the eyewitness identification, Your Honor. I mean, that truly is the biggest problem here. Because the court in denying— In most cases, we relied almost exclusively on the identification and pointed that out in the opinions. But this case has—I listed nine different facts that would identify these men to the crime. Even when they were picked up for warrants and so forth, they found the keys to both cars. They found a key to their residence, which turned out to be their mother's residence. I mean, there's just—if you put all the evidence, what it points to, it's almost conclusive that the government got the right people. Your Honor, what I would respond to that issue simply is that when you take these two robberies as separate crimes, the evidence as to, especially Troy Baylor, is only circumstantial. And that the court stated in its opinion— The family dollar crime is committed with one car, and the Wilson crime, garage crime, is committed with another car. They are able to trace one of the cars and follow the car to the house. And at the house, they see the car that was described in the other crime. Now, does that exclude that evidence from proof in the other crime? It's circumstantial evidence. Of course it is. It's all circumstantial. But the only thing that Mrs. Goh testified to was that the top of the car looked like the car— I understand. I understand. And more importantly, the district court said in denying our expert, I'm going to give you an appropriate instruction. I'm going to give you an eyewitness jury instruction. And then he failed to do so. And this court, even in Davis, in saying that there was no expert— But on those cases where we relied almost entirely on the identification, we maybe have required the Holly Telfair type of instruction only when it's the centerpiece of the case, when there's no other evidence. And I think you're absolutely right. I think identification evidence has to be guarded. It can be abused. It's often wrong. And so we have these prophylactics that help us. But in this case, with respect to the family dollar crime, the identification was pretty clear and pretty instantaneous. I didn't see anything wrong with it. I guess you say the officer was in the room. But apart from that, the fact that these men were involved in this conduct is just demonstrated by so many other things. I understand my time is up. And there were other problems with Mrs. Smith's identification. She provided descriptions of the men immediately following the robberies, which then changed and did not match the actual descriptions. What, a few inches? She said there was a tall person and a short person, didn't she? No, sir. What she actually said was that Mr. Troy Baylor was 25 to 30 years old and 5 foot to 5 foot 2 when, in fact, he is 47 years old and 5'6". And then her description thereafter changed. Thank you. All right. Thank you. Mr. Jagels. Your Honors, good morning. Mike Jagels, Special Assistant United States Attorney here in Richmond for the Eastern District of Virginia. Your Honors, recognizing the inherent problems in eyewitness identification, this is not one of those cases where prophylactic protection of an expert witness in identification is warranted. In the cases, certainly in the Seminole case, the Harris case in this district, you had what this court called a cornucopia of evidence. Here, there is even more evidence of guilt than in Harris. And with that, there is a reduced likelihood of misidentification. And that's why the district court was correct in excluding the expert witness. With respect to the various factors, I think the court was right in assessing that the common knowledge, that many of these factors come within the common knowledge of the average juror. Certainly stress is a factor that comes within common knowledge. Certainly people can recognize that stress affects memory. It affects perceptions. The difficulty with testimony such as that proposed by Dr. Cutler is applying it to or having a juror try to apply it to an average case. In this case, Dena Smith, the main eyewitness in the Family Dollar store, was approached several times in circumstances that were not stressful, in circumstances that were purely consensual, where she was asked whether or not she was the manager. She was asked whether or not there was wrapping paper, where she could find a job application. And then it became stressful later on. In fact, at one point outside, when she saw him again, she thought that he was going to ask for her phone number. And certainly there were non-stressful situations. So it's difficult for an average juror to apply or to decide how much weight to give to that stress factor when you have a stressful and non-stressful interaction with a perpetrator. With respect to cross-race, I think it's difficult for an average juror to apply as well. Dr. Cutler testified in the motion, the pretrial motion, that cross-race, while it's a factor, is heavily dependent upon that person's, the witness's, interaction with members of the different race. Was Ms. Smith African-American? She was African-American. And so you don't have that factor with respect to Ms. Smith. You do have it with respect to Ms. Goad and Ms. Miners, the other two witnesses, but certainly not with respect to Ms. Goad. Ms. Goad didn't do an identification, did she? No, nor did Ms. Miners. She did it in court, but neither of them did an out-of-court identification. But what Dr. Cutler testified to is it's dependent upon how much interaction a person has with members of that race. So I think that would necessarily devolve a cross-examination or a direct examination even of questioning, for instance, the Wilsons of how often do you hang out with African-Americans? How often do you see them? Do you have a lot of customers that are African-American? I think that certainly it devolves a trial and would confuse the jury in how they should apply the standard. With respect to the voir dire question, we think the judge was correct and did not abuse discretion. Again, this is in all these factors with respect to eyewitness identification. This case is removed from- The government objected to the voir dire question in part because the government said it would be covered in the jury instructions, as did the court, but it was not, in fact, covered in the jury instructions. So how do you respond to that? That's correct. I would submit it was covered in part in the jury instructions, in the general instruction that- Where is that in the record? It is in the- The part you're talking about. The part I'm talking about, Your Honor, if I may have one moment. $832. Thank you. $832, thank you. And what the general instruction indicates is that jurors are to look at the witnesses and their ability to perceive the event which they testified about and the time that they had to perceive the event and general factors about their observations. And so while it was not specifically covered, there was a general instruction as to witness identification and the perception of the ability of jurors to assess the perceptions of each individual witness. In addition, this is, again, a case in which there is an overwhelming amount of both circumstantial and direct evidence that removes the case from the purview of the types of cases, such as Holley or Telfair, that rely exclusively on eyewitness identification. You have primarily, and I think this is something that's really overlooked in the appellant's pleadings, is the fact that we have two videos. There's a video of each of these transactions. Admittedly, I think that Tommy Wilson's video is better, and certainly I think jurors in looking at both videos could use those videos in assessing the identities of these two individuals. In the Family Dollar store, it is admittedly darker, but you can see a number of... You can't see the faces. You can't see the faces. You can see profiles of the faces. You can see facial hair, you can see the hats, you can see the size, and you can see the race. Correct, and you can see the cane. I would submit that when James Baylor is leaning against the brick wall, he reaches into his back pocket, and I think if you look closely, you can see what looks like the barrel of a gun. Whether or not jurors pick that up in their deliberations, I don't know, but certainly you can see what looks like the barrel of a gun. The same cane, or a cane, was also found in the SUV when they were pulled over by the state trooper in January, which led to their arrest. But certainly, getting back to the videos, in the Family Dollar, or in the Tommy Wilson video, you can clearly see Troy Baylor's face towards the end of the video where they're in the front office of the business, and his hood is down, his hat is off, you can see his bald head, you can see his facial hair, and you can clearly see his face just feet away from the younger Tommy Wilson, who is pointing at him and telling him to get out of the store, that they had their money to get out of the store. Additionally, in the Tommy Wilson, you have, as Judge Niemeyer indicated, you had the DNA evidence on James, it's the hat he left. You have the similar hat that Troy is seen wearing, not only in Tommy Wilson's, but in the Family Dollar store. You had, obviously, the weapon, and you had the video evidence of the limp. You also had the pants that James was wearing. It had a very distinctive pattern on the pockets. You could see that clearly in the video and in the stills from the video. Those are the same pants he had when he was arrested in January, and I would submit that they're similar pants, and you could see the outlines, at least, of the pockets, the pants of James in the Family Dollar video as well. With respect to Troy, you had the bracelet. You had, and you can see in the… Which car had the missing hubcap? That was the SUV, and there is a video as well. That's the third video that's included in the record, and you can see, there are several interesting things about that video. First, you can see that there is a missing hubcap on that SUV. It is the same SUV that was at the Baylor's house, similar missing hubcap, Officer Spencer, who was responding to the Tommy Wilsons in the same neighborhood as the Baylor household, sped by the car, and she saw a woman in the front passenger seat, which he believed to be a woman. She saw the driver, who was Troy, and the third passenger in the back seat. That is confirmed by that third video, where you can see that Troy appears to get out of the driver's seat, and James appears to get out of the rear seat. So her observations are somewhat confirmed by that, and you can see them then go towards the building and then return to the SUV. That SUV was found minutes later at the Baylor's property. The hood's still warm, indicating that it had been driven. This was, again, a winter day. Officers enter the house. Leona Baylor lies and says that they hadn't been home, that they don't really live there. Correct. Denied that the car had been driven. And certainly the officers very astutely looked at mail and identified both Troy and James Baylor as names of potential suspects. They then went and got photographs, which led to the identifications for them in each of these cases. With respect to the eyewitness identification, Dina Smith was particularly strong. She had, again, the opportunity to view the suspects, particularly Troy, under no duress for an extended period of time in several interactions that were consensual from very close range. She was shown photo lineups. They were 44 days later, and, again, it was double blind. In other words, the person showing her the lineup did not know who the suspects were, and she correctly identified each of them. She very carefully looked at both photos and identified each of them. With respect to, I think, a point that needs to be driven home with respect to the Tommy Wilson robbery and a point that goes to appellant's argument that they did not receive a fair trial, that these Baylors did not receive a fair trial, is the fact that both Wilsons incorrectly or failed to identify one of the perpetrators. In other words, the young Wilson identified one and the older Wilson identified the other and made an incorrect identification. Correct. And then the older Wilson, at trial, incorrectly identified each of them. And so, certainly, the jurors, there's no... He's the one who was wrestling with them and looked them right in the face. Correct, correct. And, certainly, that point is driven home to jurors that, look, identifications can be unreliable. In fact, we had two right here, and they argued that. And so, certainly, that was a point that is important and that goes to the fact that they did receive a fair trial. Certainly, counsel did an effective job on cross-examination of pointing out that the effects that Dr. Cutler wanted to testify to, the effects of a weapon, the facts that indicated that some of these interactions were stressful, that they were, in some circumstances, quick or different races. So, in sum, the Baylors did receive a fair trial. And I think that the thing that separates this case from all the other cases where specific either instructions or expert testimony is warranted is the fact that all of those cases rely exclusively either on identification or... I must say that when we get cases which rely almost exclusively on identification, it's just a very uncomfortable situation. Ms. Haynes points out correctly that this stuff is probably the most problematical. People think, oh, you can identify somebody, but it is problematical. And it seems to me if the case depends entirely on the identification, we give the instruction. But not only that, I think courts have a lot of concerns. They look very closely at these cases. Understood. And in those types of cases, the prophylactic remedies are warranted. And you see this court has time and again required district courts to give either jury instructions or voir dire questions or required them to give expert testimony. But, again, this is not one of those cases. This is a case where there is overwhelming evidence, both circumstantial and direct, of the guilt of both the Baylors. They span both cases. As Your Honor pointed out, there were two cars owned by Leona Baylor. One was an Oldsmobile. One was an SUV. That Oldsmobile, the top, a similar type of top was seen by Rhonda Goats. She couldn't say, that's the car I definitely saw. But a similar type of top indicating that it was a dark top that was chrome. It was similar to the Oldsmobile. Driven by Troy Baylor, who was very close to the family dollar when he was stopped by a Chesterfield officer. And there he indicated that it was his aunt's car. He lied and said it was his aunt's car. It was not his mother's car. And he indicated that, or maybe in that case he did say it was his mom's car or his dad's car. I think later on when the trooper stopped them, he indicated he lied and said it was his aunt's car. I'll get to that in a second. But with respect to that car, it's important, that testimony, because it shows that Troy Baylor not only had access but drove that car. And drove that car near the family dollar, in the area near the family dollar where his girlfriend lived. And so it shows the familiarity with that neighborhood. And certainly it shows that Troy had access to that car. With respect to the SUV, when Troy Baylor was stopped by the state trooper, he indicated, as I indicated, that it was his aunt's car. He lied. He said it was his aunt's car. But he also expressed a familiarity with that vehicle. Not only did he have the keys in his possession, but the familiarity he expressed was that, oh, I know the brake lights are out, but he went underneath the dash and said, I know how to fix this. Did he have the keys to both cars? He did have the keys to both cars. And the residence? Yes. That's correct, Your Honor. Your Honors, if there are any more questions, I'd be happy to ask them. But otherwise I'll reserve my time. We'll ask Ms. Haines. Thank you, Your Honor. Your Honor, I'd focus first on the jury instruction. And as Judge Thacker pointed out, the judge in this case did state in denying the expert motion that he was going to give the jury instruction and then failed to do so, which I think is especially important here. Secondly, he also applied the wrong legal standard in determining whether or not to give the jury instruction. And what he said is that we've had plenty of cross-examination on this issue and you can argue it all you want. That is not the legal standard. And, in fact, other jury instructions would undermine our arguments to the jury. For example, if I can argue all I want but there's going to be a jury instruction, that my statements in summation are simply that argument. Going to, I think, really what the court is focusing on here is the weight of the evidence. I would just make a couple final comments on, first, the family dollar and then the Wilsons robbery. First, the family dollar occurred in Chester. The second robbery occurred in Richmond, Virginia. That is like saying that a robbery that occurred in Fairfax. How many blocks apart are they? I looked on a map. They're not that far apart. Oh, no, Your Honor, they are miles. It's a 15-minute drive. It's literally the difference between Fairfax and Washington, D.C. They are two entirely separate. They're 15 miles apart? They are. I think I stated that it was a 15-minute drive and I think that the mileage would have been anywhere from five. Well, that can be three or four blocks in Washington. Five to ten miles apart. Chester is an incorporated city. And where in relationship to the two places was the Leona Baylor residence? The Baylor residence was several blocks away from the Wilsons robbery, maybe five to ten blocks away. So second from that, Mrs. Smith spent only moments, seconds, with the shorter robber when he walked in and she testified. He simply asked one question and she moved on. Did she go outside and have a smoke and then he came out to talk to her? Yes, and, again, only briefly, a matter of seconds. It was sort of repetitive, though, wasn't it? There were two instances in which the shorter robber came up to her. And, in fact, when she first described the shorter robber, she gave a description which did not match Troy Baylor. The government also testified. She really didn't have any trouble picking him out, though. Well, but it wasn't, the government did state that it was a double blind, and it is accurate that the individual who handed her the lineup did not know who the suspects were, but the investigating agent officer was in the room with her when she went through that. There is the video, and as we included in the joint appendix, I believe it's on the last page, there's also a video of Troy Baylor, his nose, and a picture from the tape from the robbery which shows a different nose. And so, in this case, the jury deliberated for six hours. And, as this court has noted in other cases, certainly if the evidence was as overwhelming as the court would suggest, it wouldn't have taken six hours. You do have to consider the evidence as to Wilson's robbery separate from that as to Family Dollar. And as to Family Dollar, you had one identification. You do for the commission of the crimes, because each crime has to be supported by its own evidence. But the fact that you recover evidence at one crime that relates to the other makes it relevant. That would be accurate, Your Honor. But at least in the Family Dollar, there was evidence which was helpful to Troy Baylor and to James Baylor. There was DNA, there was fingerprints and palm prints recovered from the Family Dollar. At Family Dollar, the two walk in, and you have the video of the tall and the short with the cane and limping. And the manager says, oh, hi, Troy and James. And she can identify them. It seems to me, then, if you have the very same video at the Wilsons, then you could have her testify that that's Troy and James. It looks like Troy and James because it looks like the same two people. If you agree that it's the same two people, I know who they are. I would think you could do that to solve the Wilson as long as you could link it up. But it seems to me you have to prove each crime and prove the evidence, and you have to establish the relevance of the evidence causation. That's correct. And it should not be forgotten that as to the Family Dollar robbery, that both James and Troy Baylor, their sentences were increased by 25 years on just that robbery. And so we would suggest that if you look at the evidence as to that robbery, it is not harmless that the defense was prohibited from putting on the eyewitness expert testimony or seeking a jury instruction. Thank you. Thanks, Ms. Saenz.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker